UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HARDEEP KOMAL, | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 6619 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | |
| Defendant. | ) | |

### Memorandum Opinion and Order

Plaintiff Hardeep Komal brought this action against his former employer, Defendant Arthur J. Gallagher & Company, alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Gallagher has moved for summary judgment. The motion is granted with respect to Komal's discrimination claim and denied with respect to his retaliation claim.

### Background

The facts are set forth as favorably to Komal as the record and Local Rule 56.1 permit. Gallagher hired Komal in December 2005 to work in its Information Technology ("IT") department as a Senior Network Security Analyst at its facility in Itasca, Illinois. Komal is of Indian descent, practices the Sikh religion, maintains a full beard, and wears a turban. On December 13, 2006, Komal walked past two co-workers and heard one of them say "terrorist." The co-workers maintained that they were discussing their own appearances with and without facial hair, but Komal believed that the word was directed at him.

Komal immediately complained to Chad Fickle, his direct supervisor at the time. David Melchers—Gallagher's Chief Information Officer, Fickle's direct supervisor, and Komal's indirect supervisor—was informed of the incident about a week later. Gallagher conducted an investigation. The co-workers admitted to saying the word "terrorist" in Komal's presence, denied using it in reference to Komal, and were counseled regarding appropriate workplace conversation. They also offered to make a verbal apology. Komal rejected the offer and demanded a written apology. The demand was not satisfied, and in December 2007 Komal brought the issue directly to Melchers.

The parties contest what happened next. According to Komal, after he complained to Melchers, Melchers encouraged him to drop the issue and began generating fabricated evidence of poor performance reaching back several months before December 2007. Komal maintains that this fabricated evidence led directly to his termination in October 2008. According to Gallagher, no evidence was fabricated; rather, Komal's performance consistently deteriorated despite efforts to counsel and encourage him.

It is undisputed that in March 2007, three months after the "terrorist" incident but nine months before Komal complained directly to Melchers, Komal received an annual performance review. The evaluation concluded that Komal generally was meeting expectations, and noted that "Hardeep has done a strong job for us this year, in light of heavy demands in the network area. His ability to handle the day to day issues and support our company has been important. He has been under a heavy workload and dealt with it well." Doc. 46 at ¶ 94. The review, however, also noted that Komal failed to "follow-through" on projects on several occasions, that he had difficulty completing tasks on time, and that he needed to develop his leadership and project management skills. Doc. 52-1 at 18-19.

After the March 2007 review but before Komal's complaint to Melchers in December 2007, Komal's supervisors noted deficiencies in his performance. On multiple occasions in November 2007, Komal received "coaching" for what Bob Green, his then-supervisor, claimed to be poor communication. On December 3, 2007, Komal met with Green to address what Green claimed to be Komal's failure to correct certain technical problems and failure to respond to requests for further assistance. In January and February 2008, after Komal's complaint to Melchers, Komal repeatedly was warned and counseled about what his supervisors claimed to be attendance problems and unacceptable work product. In the meantime, in December 2007 or January 2008, Calvin Wright, who was Komal's supervisor at certain points, asked him whether he was a Muslim. A co-worker asked him the same question the following summer.

Komal had his next annual performance review in April 2008. Melchers took direct responsibility for the review. Although Melchers indirectly supervised about 270 employees, Komal was the only such employee for whom Melchers could recall exercising such responsibility. The review stated that Komal needed improvement in three of six designated areas and had additional "development needs," and gave Komal an overall rating of "less effective." Doc. ___ at 12-13. Like the 2007 review, the 2008 review stated that Komal had to improve his leadership, productivity, and follow-through; unlike the 2007 review, the 2008 review also stated that Komal had trouble accepting technical changes, struggled to solve technical problems, had poor attendance, and had difficulty communicating technical issues.

Following the April 2008 review, Komal was placed on a six-week Performance Improvement Plan ("PIP"), a program intended to provide low-performing employees with personal counseling and targeted feedback in order to improve their work. Komal's PIP stated that its goal was to improve his attendance and punctuality, increase his productivity, and

improve his troubleshooting skills and ability to communicate regarding technical issues. During the PIP, Komal met every one to two weeks with Wright and Melchers to discuss Gallagher's expectations and to review the prior week's performance. According to Komal, Melchers repeatedly encouraged him to quit. Gallagher's take is that Melchers merely offered Komal a "graceful exit" in light of his performance problems.

During Komal's PIP, Gallagher continued to receive complaints about Komal from his colleagues regarding his communication skills, failure to follow-through on projects, inability to problem-solve, and failure to provide thorough solutions to computing problems. On May 27, 2008, Komal received a written warning that extended his PIP until the end of June 2008 and that warned that he could be terminated if he failed to meet the PIP's objectives. According to Gallagher, Komal continued to have performance problems, was suffering from "eroding credibility," and was deemed by Melchers to no longer be "fit for the role." Komal attributes any performance issues to the fact that Gallagher practiced discrimination by giving him only partial access to Gallagher's Cisco operating system, to which co-worker Carl Schneider had greater access, and by giving co-worker Christine Bannia "access to infrastructure and devices" denied to him.

The PIP concluded on June 30, 2008. Komal contends that his performance thereafter was "exemplary." On October 8, 2008, Komal was fired. Gallagher submits that before the termination, Komal rejected the company's offer of a modified position in the IT department that would have focused his responsibilities on tasks he performed well and eliminated duties he performed poorly. Komal denies that any such offer was made.

On July 24, 2008, over two months before his termination, Komal filed a charge with the Equal Employment Opportunity Commission ("EEOC"), which stated in relevant part:

> In December 2006 I engaged in a protected activity. Subsequently I have
> been discriminated against in that I have been harassed, subjected to
> unequal terms and conditions of employment, and disciplined. I believe
> that I have been discriminated against because of my race, Asian, national
> origin, India, religion, Sikh, and retaliated against for engaging in protected
> activity, in violation of Title VII of the Civil Rights Act of 1964, as
> amended.

Doc. 1-2 at 3. After his termination, Komal filed a second EEOC charge, which stated in relevant part: "On July 24, 2008, I filed a charge of discrimination with the EEOC against [Gallagher]. On October 8, 2008, I was discharged. I believe I have been discriminated against for engaging in protected activity." Doc. 1-2 at 1.

The EEOC issued right-to-sue letters to Komal, who timely filed this lawsuit on October 21, 2009. Count II of the complaint alleges that Komal was subjected to racial, ethnic, and religious discrimination at Gallagher. Count I alleges that Gallagher retaliated against Komal for complaining about the discrimination.

## Discussion

**I.     Komal's Hearsay Objection to Gallagher's Documentary Evidence**

Komal maintains that each document attached to and cited by Gallagher's Local Rule 56.1 statement is inadmissible hearsay. "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). The objected-to documents include emails, meeting memoranda, performance reviews, Gallagher policies, and disciplinary documents. Gallagher responds that the documents are business records and therefore excepted from the hearsay rule.

The dispute is governed by Federal Rule of Evidence 803(6), which provides that the hearsay rule does not bar

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11) [or] Rule 902(12).

Fed. R. Evid. 803(6). "To be admissible as a business record, a document must have sufficient indicia of trustworthiness to be considered reliable." *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). "Normally, to demonstrate such trustworthiness and reliability at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the [business] record as evidence at trial, for example, a custodian or anyone qualified to speak from personal knowledge that the documents were admissible business records." *Ibid.*; *see also Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006). "Authentication does not erect a particularly high hurdle to admissibility, and is 'satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Asher v. Baxter Int'l, Inc.*, 2009 WL 260979, at *6 (N.D. Ill. Feb. 4, 2009) (quoting Fed. R. Evid. 901(a)).

Komal's objection to Gallagher's documentary evidence is overruled. Gallagher submitted two affidavits that together support the admissibility of nearly all the documents. The first affidavit, from Melchers, attaches various meeting notes, emails, performance reviews, and PIP documents, and avers that those documents either were drafted by him or were created in the normal course of business overseen by him. The second affidavit, from Sara Eggers, a Gallagher Corporate Human Resources Manager who serves as a custodian of Gallagher's employment documents and policies, attaches other documents and avers to their accuracy. The affidavits are

sufficient to support the admissibility of the attached documents as business records, permitting Gallagher to deploy them at the summary judgment stage. *See O'Grady v. Commonwealth Edison Co.*, 2010 WL 4223212, at *2 (N.D. Ill. Oct. 19, 2010); *Lee v. Anthony Wayne Servs.*, 2005 WL 1459440, at *3 (N.D. Ind. June 20, 2005).

Some of the documents attached to Gallagher's Local Rule 56.1 statement are not addressed by the affidavits. But Komal admitted nearly all of the factual allegations based on those documents. *See* Doc. 46 at ¶¶ 8-9, 13-14, 19, 30, 32, 45, 47, 56, 64-65. Once a party admits that an unauthenticated exhibit contains truthful information, "the court may consider the material in that exhibit because 'an admission is, of course, admissible evidence.'" *Woods*, 234 F.3d at 989 (quoting *In re Sunset Bay Assocs. v. Eureka Fed. Sav. & Loan Ass'n*, 944 F.2d 1503, 1513-14 (9th Cir. 1991)). To the extent the factual allegations and documents refer to Komal's allegedly inadequate job performance, this court considers the allegations only for the fact that Komal's supervisors *claimed* that Komal was performing inadequately, not for the truth of the matter asserted in the documents—*i.e.*, that Komal *actually was* performing inadequately. *See Stewart v. Henderson*, 207 F.3d 374, 377 (7th Cir. 2000) (in Title VII case, affirming use of employment committee chairperson's affidavit as evidence of chairperson's state of mind when he recommended against promoting plaintiff to managerial position, but not as evidence that plaintiff actually had the shortcomings that chairperson believed he had).

## II.     Retaliation Claim (Count I)

Count I alleges that Gallagher retaliated against Komal in violation of Title VII and § 1981 after he complained to Melchers about the "terrorist" statement. Title VII forbids an employer from discriminating against an employee who "opposed any practice" prohibited by Title VII or who "made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms … by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). Section 1981 "prohibits racial discrimination in making and enforcing contracts, [and] encompasses retaliation claims." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Retaliation under both provisions implicates the same elements. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008).

To survive summary judgment on his retaliation claim, Komal may proceed under either the direct or indirect method of proof. *Id.* at 404. Only the direct method need be considered here. Under the direct method, Komal must present evidence that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse employment action; and (3) a causal connection exists between the two. *Ibid.* (citing *Burlington N.*, 548 U.S. at 68-69). Gallagher concedes that Komal engaged in statutorily protected activity when he brought the "terrorist" incident directly to Melchers's attention in December 2007. (Komal identifies two other protected activities—bringing the "terrorist" incident to his direct supervisor's attention in December 2006, and filing his pre-termination EEOC charge in July 2008—but his summary judgment papers do not contend that Gallagher retaliated against him for those activities.) Gallagher also concedes that Komal's termination was a materially adverse employment action. Gallagher disputes, however, that a causal connection exists between Komal's complaint to Melchers in December 2007 and Komal's October 2008 termination.

To establish a causal connection, Komal may rely on either direct or circumstantial evidence. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). Direct evidence of retaliation typically requires an admission of discriminatory animus, *see Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009), and is "predictably rare," *Stephens*, 569 F.3d at 787. Indirect evidence of retaliation may consist of "a convincing mosaic of circumstantial evidence that allows a jury to infer" that the adverse employment action arose from retaliation. *Phelan v. Cook Cnty.*, 463 F.3d 773, 779-80 (7th Cir. 2006) (citation omitted). A "convincing mosaic" may be established by "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of" causation might be drawn. *Silverman v. Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (citation omitted). The appropriate focus "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks and citation omitted).

Komal maintains that circumstantial evidence establishes the necessary causal link, arguing that "[a]t the same time that [he] complained to Melchers, the plan to terminate him was set in action." Doc. 47 at 5. According to Komal, the plan was evidenced by (1) newly-generated evidence of performance deficiencies; (2) a negative performance review in 2008; (3) Melchers's direct involvement in Komal's 2008 review; (4) Komal's placement on a PIP and Melchers's repeated encouragement that he quit; and (5) Komal's termination despite his "exemplary" work following the PIP. Komal concludes that "[t]he timing issue coupled with the

additional evidence that Melchers went out of his way to sabotage [him] here is more than sufficient to establish causation." *Id*. at 6.

The parties disagree over whether the timing of the two key events—Komal's October 2008 termination followed his December 2007 complaint to Melchers by ten months—supports or undermines causation. Both parties overemphasize the issue, as timing has never been "dispositive in proving or disproving a causal link" between an employee's complaint about discrimination and a subsequent adverse employment action. *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003); *see also Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("suspicious timing, standing alone, 'will rarely be sufficient … to create a triable issue'") (quoting *Culver v. Gorman*, 416 F.3d 540, 546 (7th Cir. 2005)); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006) ("suspicious timing alone … does not support a reasonable inference of retaliation" because the "mere fact that one event preceded another does nothing to prove that the first event caused the second") (citation omitted).

As it happens, Komal need not rely exclusively on timing, as other circumstantial evidence, together with timing, is sufficient to permit a jury to conclude that he was terminated for complaining directly to Melchers about the "terrorist" incident. Komal presented evidence that Melchers tried to convince him to drop his complaint, and that when he refused, Melchers pressured him to resign. Doc. 46 at ¶ 79; Doc. 46-2 at 110-13. Whether Melchers pressured Komal to drop the complaint, what Melchers intended by encouraging a "graceful exit," and how Melchers went about that process are disputed questions of fact that counsel against summary judgment. *See Owens-Floyd v. City of Chicago*, 2007 WL 4365324, at *5 (N.D. Ill. Dec. 11, 2007) (claim survived summary judgment where plaintiff presented evidence that, among other things, her supervisor discouraged her from filing charges). In addition, Melchers took the

unusual and possibly unique step of taking direct responsibility of Komal's performance review shortly after Komal complained to him about the "terrorist" comment. Although Gallagher maintains Melchers was simply trying to ensure fairness in the review process, given the rapid turnover among Komal's direct supervisors during the relevant period, Melchers did not assume responsibility for the reviews of other employees whom he indirectly supervised and who experienced the same turnover of direct supervisors. The unusualness of Melcher's act (Komal is one of 270 employees Melchers indirectly supervises, and one of several who saw their direct supervisors change), in addition to Melchers's efforts to have Komal drop his complaint and leave the company, would permit a reasonable jury to find causation. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 905 (7th Cir. 2006) (unusual circumstances surrounding the termination prevented summary judgment).

Under the Seventh Circuit's recent decision in *Silverman v. Board of Education of the City of Chicago*, *supra*, because Komal has presented circumstantial evidence that would allow a jury to infer causation under the direct method, "the defendant's summary judgment motion necessarily must fail, in contrast to the burden-shifting approach of the indirect, *McDonnell Douglas* method," which gives the defendant an opportunity to establish a valid, non-retaliatory reason for the termination. 637 F.3d at 734 n.3. Earlier Seventh Circuit authority appears to point in a different direction, holding that "[a]lthough we often discuss the employer's proffer of a nonretaliatory explanation and the corresponding pretext inquiry in terms of the *McDonnell Douglas* burden-shifting framework embodied by the indirect method, an employee's failure to case doubt on an employer's nonretaliatory explanation will also doom a retaliation claim under the direct method." *Argyropoulos*, 539 F.3d at 736 n.6 (citations omitted).

Komal could survive summary judgment under the direct method even if he were required to cast doubt on Gallagher's nonretaliatory explanation for his termination—that Komal's substandard performance justified the termination irrespective of any retaliatory motive. There are material factual disputes regarding whether Komal successfully completed his PIP and whether Komal performed satisfactorily after the PIP. Komal's PIP ended in late June 2008, over three months before his October 2008 termination; this is a potentially material gap given Melchers's inability to identify or recall any performance problems between June and October, Doc. 46-1 at 71-72, and given Gallagher's admission that Komal did not have any attendance issues after the PIP, Doc. 53 at ¶ 88. Considered in conjunction with Melchers's assumption of direct responsibility for Komal's performance review and his efforts to have Komal resign, Komal has adduced sufficient evidence to allow a jury to reject Gallagher's nondiscriminatory rationale for his termination.

This is not to say, of course, that Komal will prevail at trial. There is more than enough evidence to allow a reasonable jury to conclude that Komal's performance was truly substandard, that Gallagher afforded him ample opportunities to improve, and that his termination was wholly justified. But the record does not permit that determination to be made on summary judgment.

### III. Discrimination Claim (Count II)

Komal's opposition to summary judgment on the discrimination claim states, in its entirety: "For the same reasons as those set forth above [with respect to the retaliation claim], summary judgment on the issue of discrimination should be denied." Doc. 47 at 9. The problem with this approach, among others, is that the retaliation and discrimination claims involve distinct theories of liability and share few common facts. The retaliation claim alleges that

Komal was terminated because he complained to Melchers about the "terrorist" incident. The discrimination claim concerns three instances of alleged harassment—the "terrorist" incident and the two times Komal was asked if he was a Muslim—and two respects in which Komal's access to computer hardware allegedly was limited. Doc. 46 at ¶¶ 68-72. Accordingly, Komal cannot rely on his arguments regarding the retaliation claim to stave off summary judgment on his discrimination claim. *See Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997) ("the elements of a prima facie case of race discrimination and retaliation are different"). It follows that Komal forfeited his discrimination claim. *See Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006) (party forfeits any arguments it fails to raise in a brief opposing summary judgment); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (claim deemed abandoned when plaintiff "failed to delineate his negligence claim in his district court brief in opposition to summary judgment"); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (arguments not presented to district court in response to summary judgment motion are waived).

Even putting aside Komal's general forfeiture of his discrimination claim, the claim fails in its particulars. The three alleged incidents of harassment, involving three different individuals over the course of two years, are not actionable under Title VII or § 1981. Asking Komal whether he was a Muslim was clumsy and discourteous, violating the rules of workplace etiquette, but nothing more. The "terrorist" statement was an isolated incident. As Gallagher maintained, "inappropriate but isolated comments that amount to no more than 'stray remarks' in the workplace will not" establish a harassment claim. *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997); *see also Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002); *Randle v. La Salle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). Komal's failure to

respond on the merits to this argument, or to any of the other arguments Gallagher specifically directed towards the harassment allegations (Doc. 36 at 3-6), operates as a forfeiture of any discrimination claim based on harassment. *See Ho v. Taflove*, __ F.3d __, 2011 WL 2175878, at *7-8, *10 (7th Cir. June 6, 2011).

With respect to the alleged discrimination against Komal regarding access to computer systems, Gallagher maintained that the mere denial of access to certain computer programs is not a materially adverse employment action and therefore cannot support a discrimination claim. *See Feiss v. Metro. Water Reclamation Dist. of Greater Chicago*, 2003 WL 1964212, at *6-7 (N.D. Ill. Apr. 28, 2003); *EEOC v. Outsourcing Solutions Inc.*, 2002 WL 31409584, at *10 (N.D. Ill. Oct. 24, 2002) (where there is no diminution of pay or benefits, deprivation of certain computer resources was not an adverse employment action). As with the harassment allegations, Komal's failure to respond to this argument or to any of the other arguments Gallagher specifically directed towards the unequal terms and conditions component of his discrimination claims (Doc. 36 at 7-10) operates as a forfeiture. *See Ho*, 2011 WL 2175878, at *7-8, *10.

**Conclusion**

For these reasons, Gallagher's motion for summary judgment is granted as to the discrimination claim and denied as to the retaliation claim. This case will proceed to trial on the retaliation claim.

June 13, 2011

_____
United States District Judge